1

2              **UNITED STATES DISTRICT COURT**

3                    **DISTRICT OF NEVADA**

4

5   NOLAN KLEIN,                      )
                                       )        3:05-CV-0390-PMP (VPC)
6              Plaintiff,             )
                                       )
7        vs.                           )        **REPORT AND RECOMMENDATION**
                                       )        **OF U.S. MAGISTRATE JUDGE**
8   DON HELLING, ET AL.,              )
                                       )
9              Defendants.            )        January 17, 2007
    _____)

10

11         This Report and Recommendation is made to the Honorable Philip M. Pro, United States

12   District Judge.  The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C.

13   § 636(b)(1)(B) and LR IB 1-4 Before the court is plaintiff's motion for summary judgment and/or

14   partial summary judgment (#38).[1]   Defendants opposed (#48) and filed a cross-motion for

15   summary judgment (#50).[2]  Plaintiff replied to defendants' opposition and opposed defendants'

16   cross-motion for summary judgment (#58).  Defendants replied to plaintiff's opposition (#60).

17

18   The court has thoroughly reviewed the record and the motion and recommends that both plaintiff's

19   motion for summary judgment (#38) and defendants' cross-motion for summary judgment (#50)

20   be denied.

21

22              **I.  HISTORY & PROCEDURAL BACKGROUND**

23         Plaintiff Nolan E. Klein, a *pro se* prisoner, is currently incarcerated by the Nevada

24   Department of Corrections ("NDOC") at the Lovelock Correctional Center ("LCC") (#16, 21).

25   _____

26         [1] In support of his motions, plaintiff submits Plaintiff's Exhibits to Motion (#43), Plaintiff's
    Supplemental Exhibits to Motion (#55) and various affidavits (#s 39, 40, 41, 42).

27
         [2] In support of their motions, defendants filed, under seal, an *in camera* submission titled
28   "confidential NDOC Inspector General's Report and Materials" (#62).  Defendants also filed under seal
    "Plaintiff's NDOC 'Chrono Files' Bearing Bates Range D-MSJ 1-10," a copy of which was served on
    plaintiff (#52).

Plaintiff brings his complaint pursuant to 42 U.S.C. § 1983, alleging that prison officials retaliated against him after he exercised his First Amendment rights (#21).[3]  Plaintiff names as defendants Don Helling ("Helling"), Warden of Northern Nevada Correctional Center ("NNCC"); James Benedetti ("Benedetti"), Assistant Warden of NNCC; and Chuck Fournier ("Fournier"), Correctional Officer/Investigator at NNCC.  *Id.*

In count I, plaintiff alleges that the defendants retaliated against him by removing him from the general population at NNCC and transferring him to LCC "because of Plaintiff's efforts to exercise his U.S. Constitution First Amendment Rights to seek redress through the court and grievances, his right to free speech, his right to provide information, as well as his right to assist other inmates with legal matters." *Id.*, p. 4.  Plaintiff states that because of the allegedly retaliatory transfer, he lost his "prison job, pay, work credits, and earned preferred housing assignment, his religious practices, physical disabilities and property." *Id.*  Plaintiff additionally alleges that the defendants "collectively conspired to chill the effect of Plaintiff's exercise of his First Amendment Constitutional Rights." *Id.* at 3, 4.

Specifically, the plaintiff contends that due to back and hip injuries, he was "medically assigned" to NDOC's regional medical facility at NNCC in 2001. *Id.*, ¶ 1.  Plaintiff was housed in NNCC Unit 3, which is apparently recognized as a unit where housing rules are more relaxed to facilitate the daily activities of disabled prisoners. *Id.*, ¶¶ 2-3.  Plaintiff alleges that in October 2004, at the direction of the Warden, NNCC began to strictly enforce the prison's housing rules in Unit 3 to purposely make it more difficult for disabled prisoners. *Id.*, ¶ 4.  Plaintiff contends that other Unit 3 inmates consulted him and it was agreed that plaintiff would find counsel to file a class action to ensure compliance with the Americans with Disabilities Act ("ADA"). *Id.*, ¶ 5.

---

[3] Plaintiff filed his original complaint on August 8, 2005 (#7) and his first amended complaint on January 6, 2006 (#21).

Plaintiff contacted Treva Hearne, Esq. ("Ms. Hearne"), who sent a letter to Jackie Crawford, Director of NDOC, setting out the Unit 3 inmates' concerns. *Id.*, ¶¶ 6-8; *see also* #43, Ex. 1. Allegedly, Unit 3 conditions thereafter returned to pre-October 2004 conditions. *Id.*, ¶ 8.

Beginning in March 2005, a number of incidents occurred which led plaintiff to conclude that defendants were retaliating against him for the potential class action, as well as for contributing to a book entitled, *To Prove His Innocence*, which was published in February 2005 and reflected poorly on certain NDOC administration officials, including Helling. *Id.*, ¶ 10. The allegedly retaliatory incidents include the following: (1) a law librarian told plaintiff that he should be locked up or transferred for promoting a lawsuit (*Id.*, ¶ 9); (2) prison officials cancelled two appointments Ms. Hearne made to meet with the plaintiff without explanation, although Ms. Hearne's law partner was allowed to meet with plaintiff on the same day Ms. Hearne's cancelled appointment had been scheduled (*Id.*, ¶¶ 10-11); (3) defendants moved the plaintiff from the medical unit to a restrictive unit at NNCC, Unit 7b, allegedly because the prison was investigating whether plaintiff had assisted another inmate ("Inmate A"),[4] in locating counsel to draft a trust ("Inmate A Trust") (*Id.*, ¶¶ 13-14); (4) Fournier, who was the officer in charge of the Inmate A Trust investigation, was disinterested when Ms. Hearne called to inform him that the plaintiff would not benefit under the Inmate A Trust (*Id.*, ¶ 15); and (5) prison officials transferred plaintiff from NNCC Unit 7b to LCC while he was still under investigation for the Inmate A Trust matter (*Id.*, ¶¶ 17-21).

Plaintiff alleges that prior to his transfer to LCC, he had not had a disciplinary infraction in over five years, and that to this day, prison officials have never told him why he was under

---

[4] For confidentiality purposes, the court will refer to this inmate only as "Inmate A." The details of this investigation are central to the case and will be set out in greater detail below.

investigation, nor has plaintiff ever received any disciplinary citation or violation. *Id.*, ¶¶ 21-23. Plaintiff was told that he could not be transferred back to NNCC from LCC until he was no longer under investigation, but shortly thereafter, he was transferred back to NNCC and placed in restrictive Unit 7b instead of Unit 3,[5] apparently because he had been placed on another inmates' (later discovered to be Inmate A) "enemy list." *Id.*, ¶¶ 26-28.  Plaintiff alleges that being placed on an inmate's "enemy list" is a method defendants use to keep prisoners in restrictive housing when defendants have no legitimate reason to do so, since an inmate has no way to challenge another inmate's confidential "enemy list." *Id.*, ¶¶ 29-30.  Plaintiff further alleges that Inmate A has informed him that he did not place the plaintiff on his "enemy list." *Id.*, ¶ 31.

After reviewing a copy of the trust and other documents from the confidential report, the court finds that the following facts regarding the Inmate A Trust are undisputed:

(1) Tonja Brown, the plaintiff's sister, was the trustee of the Inmate A Trust (#62, D-MSJ 29-39 (*sealed*);

(2) Robert Brown, Ms. Brown's husband and the plaintiff's brother-in-law, was the successor trustee of the Inmate A Trust, *id.*;

(3) Inmate A had all of the assets in his Wells Fargo checking account transferred into the trust, *id.*;

(4) Inmate A's Wells Fargo checking account was titled "[Inmate A], Tonja F. Brown, POA," *id.*;

(5) the Trustee had full discretion over the trust assets as she "deem[ed] proper for [Inmate A's] comfort, welfare and happiness" and was entitled to "reasonable expenses for services rendered, payable without court order," *id.*;

---

[5] Plaintiff has since been transferred back to LCC (#16).

4

(6)  Joseph M. Carpino, another inmate at NNCC, was the trust beneficiary, *id.*; and

(7) Ms. Hearne, who has acted as the plaintiff's attorney on a number of occasions, drafted the Inmate A Trust (#39, ¶7).

The court notes that the plaintiff is proceeding *pro se*.  "In civil rights cases where the plaintiff appears *pro se*, the court must construe the pleadings liberally and must afford plaintiff the benefit of any doubt." *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988); *see also Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

## II.  DISCUSSION & ANALYSIS

### A.  Discussion

#### 1.  Summary Judgment Standard

Summary judgment allows courts to avoid unnecessary trials where no material factual disputes exist. *Northwest Motorcycle Ass'n v. U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The court grants summary judgment if no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(C).  In deciding whether to grant summary judgment, the court must view all evidence and any inferences arising from the evidence in the light most favorable to the nonmoving party. *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996).  In inmate cases, the courts must

> [d]istinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, __ U.S. __, 126 S.Ct. 2572, 2576 (2006).  Where reasonable minds can differ on the material facts at issue, however, summary judgment should not be granted. *Anderson v.*

5

*Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears the burden of informing the court of the basis for its motion, and submitting evidence which demonstrates the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings but must set forth specific facts showing that there exists a genuine issue for trial. *Anderson*, 477 U.S. at 248. Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322-23.

### 2. First Amendment Retaliation

Prisoners have a right to meaningful access to the courts, and prison authorities may not penalize or retaliate against an inmate for exercising this right.  *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995).  Prison officials may be sued under Section 1983 for retaliating against a prisoner for exercising his or her constitutional rights.  *Pratt v. Rowland*, 65 F.3d 802, 806 & n.4 (9th Cir. 1995).  A retaliation claim involves five elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not advance a legitimate correctional goal."  *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2004).

Although an inmate alleging a retaliatory transfer has "no constitutionally-protected liberty interest in being held at, or remaining at, a given facility," an inmate need not establish "an independent constitutional interest in… assignment to a given prison… because the crux of his

claim is that state officials violated his *First Amendment* rights by retaliating against him for his protected speech activities." *Pratt*, 65 F.3d at 806 (emphasis in original). Retaliation claims must be evaluated in light of the deference accorded to prison officials. *Id*. at 807. The inmate bears the burden of pleading and proving the absence of legitimate correctional goals for the alleged retaliatory action. *Id*. at 806; *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003). The Ninth Circuit has recognized that "timing can properly be considered as circumstantial evidence of retaliatory intent." *Id*., *citing Pratt*, 65 F.3d at 808.

### 3. Conspiracy

Pursuant to 42 U.S.C. § 1985, a plaintiff has a cause of action if two or more state actors conspire to deprive him of his constitutional rights. 42 U.S.C. § 1985(3). A claim under section 1985 must allege facts to support the allegation that defendants conspired together, and a mere allegation of conspiracy without factual specificity is insufficient. *See Johnson v. State of California*, 207 F.3d 650, 655 (9th Cir. 2000), *citing Karim-Panahi v. Los Angeles Police Department*, 839 F.2d 621, 626 (9th Cir. 1988).

### B. Analysis

#### 1. Plaintiff's motion for summary judgment

##### a. Retaliation

Plaintiff alleges that the defendants retaliated against him because he contacted Ms. Hearne regarding a class action lawsuit on behalf of disabled prisoners in NNCC Unit 3 and because he contributed to a book that did not reflect well on Helling and another prison administrator (#38). Plaintiff asserts that Fournier began an investigation into plaintiff's involvement with the Inmate A Trust only because defendants Helling and Benedetti needed a basis to carry out their retaliation against the plaintiff for exercising his First Amendment rights. *Id*., p. 13. Plaintiff contends that

7

proof that the investigation was a retaliatory sham is that Fournier has never spoken to plaintiff regarding Inmate A's allegations that the plaintiff defrauded Inmate A, nor did Fournier listen to Ms. Hearne when she called to advise him that the plaintiff had no involvement in the Inmate A Trust nor would he benefit from it. *Id.*, pp. 12-13. Further, plaintiff alleges that another unnamed inmate designated in the Inmate A Trust stood to benefit, but that the other inmate was never punished, transferred or investigated. *Id.*, p. 12. Benedetti placed the plaintiff on a transfer list and then on Inmate A's enemy list two days before he even responded to plaintiff's informal grievance questioning why plaintiff had been placed in Unit 7b. *Id.*, pp. 14-15. Plaintiff was transferred to LCC on May 3, 2005 while he was still under investigation for his involvement in the Inmate A Trust, *id.*, p. 15, and it was not until June 22, 2005, that the defendants told him he was transferred to LCC "for safety and security reasons." Plaintiff has never been written up for any disciplinary infraction or received any notice of violation. *Id.*

Plaintiff also alleges: (1) plaintiff engaged in all of his First Amendment activity between December 2004 and March 2005, most of which was directed at Helling and Benedetti; (2) defendants were aware that Ms. Hearne was involved in possibly filing a class action against NDOC for violations of the American with Disabilities Act ("ADA") and she had assisted plaintiff in publishing the book *To Prove His Innocence*; (3) Helling interfered with Ms. Hearne's access to the plaintiff in March 2005 by canceling her visits without justification; (4) when defendants learned that Ms. Hearne had prepared the Inmate A Trust, they took advantage of "this particular obscure connection between Plaintiff and Inmate A's Trust to perfect their veiled attempt to silence or chill Plaintiff's First Amendment conduct;" (5) Ms. Hearne's explanation to Fournier that plaintiff was not named in the Inmate A Trust should have removed all suspicion from plaintiff;

and (6) Benedetti "knew the jig was up" after Ms. Hearne called to explain; therefore, Benedetti had plaintiff transferred to LCC. *Id*., pp. 16-19. Plaintiff submits an affidavit in which he affirms that he was not given notice of the April 27, 2005 reclassification hearing in which the transfer decision was made, nor did he attend the hearing or present evidence in his defense (#59). Additionally, the unit to which plaintiff has been assigned at LCC contains just as many – or more – elderly inmates as were in his unit at NNCC such that there is no significant difference between the two units. *Id*.

Defendants maintain that there are disputed facts, but that the facts overwhelmingly favor defendants; therefore, summary judgment should be granted in their favor on their cross-claim (#48, p. 10). Defendants argue that plaintiff's original 2001 placement at NNCC was always intended to be temporary because plaintiff had been classified to the sex offender program at LCC, and he was moved to NNCC to be given a hip injection while awaiting transfer to LCC. *Id*., pp. 10-11; *see also* #51, D-MSJ 5 (entry for May 1, 2001); *see also* Helling's Affidavit, D-MSJ 76. The plaintiff was never "medically assigned" to NNCC as he alleges, and the prison officials intended to transfer the plaintiff to LCC many years before the plaintiff engaged in any protected First Amendment conduct (#48, p. 11).

The defendants further claim that Ms. Hearne's December 2004 letter to Director Crawford complaining about ADA violations did not identify the plaintiff, and any inference that Director Crawford created problems for defendants Helling and Benedetti, who then in turn retaliated against the plaintiff based on the content of the letter and the threat of a lawsuit, is unsupported. *Id*., p 12. Helling attests that he has come to view the threat of an inmate lawsuit as an "ordinary incident of prison administration," and that such a common threat would not result in retaliation.

*Id.*, p. 13; *see also* Helling's Affidavit, D-MSJ 80.  Helling also affirms that a policy instituted in October 2004 to prevent inmate-on-inmate assaults did make it more difficult for the NNCC Unit 3 medical inmates, but when this was discovered, Unit 3 was exempted from the new policy.  *Id*.

Defendants also contend that plaintiff's allegation that the law librarian told him sometime in March 2005 that he should be locked up or transferred for promoting a lawsuit in violation of prison policy is hearsay, and therefore inadmissible.  *Id*.  Further, defendants argue that there is no connection between the law librarian's statement and the actual defendants in this case.  *Id.*, p. 14.

Defendants additionally argue that Helling did not improperly interfere with meetings between the plaintiff and his attorney, Ms. Hearne, in March 2005.  *Id*.  Ms. Hearne had requested permission to bring in the book *To Prove His Innocence* to the plaintiff for signing, and that Helling properly denied the request pursuant to prison regulations.  *Id.*, p. 16; *see also* D-MSJ 11. The visit was not perceived to be an attorney-client visit, but rather, a book-signing visit.  In any event, Ms. Hearne failed to clarify that the visit was to confer with her client.  *Id.*; *see also*, Helling's Affidavit, D-MSJ 80.  Further, *To Prove His Innocence* does not disparage Helling and plaintiff admitted in his deposition that he never even read the book and did not write anything critical of Helling.  *Id.*, p. 17 and *citing* D-MSJ 116, p. 100-101.

Defendants note that inmates have no independent right to be housed at any particular correctional facility, *see id.*, p. 18, *citing Hewitt v. Helms*, 459 U.S. at 467, n.4; however, they also concede that the defendants may not transfer a prisoner in retaliation for protected conduct.  *Id.*, p. 18, *citing*, 120 F.3d at 1077-78.  Defendants assert that plaintiff has failed to show that they took adverse action against him since separating plaintiff from potential fraud victims does not constitute adverse action, and plaintiff has no right to choose the locale of his confinement.  *Id.*,

p. 20.  Defendants point out that plaintiff is in general population at LCC, not administrative segregation; thus, he is confined under similar conditions as NNCC.  *Id.*  Further, plaintiff admitted in his deposition that the medical treatment at LCC was "probably adequate," and that he has been given the opportunity to return to NNCC for required medical treatment if necessary.  *Id.*

The defendants argue that the basis for their transfer decision – the Inmate A Trust investigation – was for the legitimate penological purpose of protecting elderly inmates.  *Id.* at 28. On April 14, 2005, Fournier received a complaint from Inmate A that: the plaintiff had approached Inmate A and convinced him that he needed to set up a trust account for his retirement money; that the trust was set up by Ms. Hearne with the plaintiff's sister, Tonja Brown, as trustee; that Inmate A had not received any account statements for the trust; and that Inmate A believed he had been defrauded.  *Id.*, p. 21; *see also* Helling's Affidavit, D-MSJ 85-86.  Fournier drafted a report and referred the investigation to the Inspector General's office, which began a confidential investigation into the matter.  *Id.*, p.22.  Plaintiff and Inmate A were immediately separated.  *Id.* In response to the allegation that Fournier was not interested in the plaintiff's side of the story, defendants argue that Fournier was under an obligation to keep the details of the investigation confidential, which was why he was not forthcoming when Ms. Hearne called him on April 19, 2005.  *Id.*  The Inspector General's office subsequently referred the matter to the criminal division of the Attorney General's office.  *Id.*  During the investigation, it was discovered that Robert Brown, the plaintiff's brother-in-law (Tonja Brown's husband), was the successor trustee for the Inmate A Trust.  *Id.*, p. 27.

Pursuant to Administrative Regulation ("AR") 522, it is NDOC's responsibility to determine whether inmates need to be physically separated from each other, and staff may do so

11

if there is a significant need.  *Id.*, p. 23.  The final determination whether an inmate is removed from a "separatee" list is at the discretion of NDOC staff rather than with the protected inmate. *Id*.  Plaintiff has been separated from Inmate A and others similarly situated since April 14, 2005 due to the investigation into the potential fraud, although defendants admit that "no formal disciplinary or criminal charges were leveled against" plaintiff.  *Id.*, p. 25.  Nevertheless, Helling states that in his long tenure as a prison administrator and under the totality of the circumstances – Inmate A came forward on his own, he had not received statements, he is elderly, the plaintiff has a history of extracting payment from other inmates[6], and the inter-relationship between the parties to the trust – it was and is his opinion that the plaintiff should remain separated from Inmate A and other elderly and easily confused inmates.  *Id*.  Based on these facts, keeping the plaintiff away from such potential victims serves a legitimate penological interest.  *Id.*, p. 26.

In his reply, plaintiff restates his original arguments and claims he has suffered adverse actions, including loss of his prison job, ten days per month work time credits, and preferred housing (#58, pp. 8-19).  Finally, plaintiff contends that Inmate A had made "similar unfounded claims in the past, sometimes against prison staff, which should have raised a red flag necessitating further investigation before jumping to conclusions."  *Id.*, p. 24.

Viewing the evidence in the light most favorable to the defendants, the court concludes that the plaintiff has not met his burden of proving the absence of legitimate correctional goal for the

---

[6] Defendants point to a 2001 disciplinary infraction in which plaintiff was found guilty of committing an "MJ 29" violation for charging or collecting a fee or favors for services as a counsel-substitute, legal assistant or "writ-writer."  *See* #48, p. 26; *see also* D-MSJ 7, entry dated Jan. 30, 2001.  Plaintiff contends that this infraction was a misunderstanding over a $100 deposit to his account "from a person not known to him" regarding his typewriter (#28).

1  alleged retaliatory transfer. *See Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1997).

2      The defendants have a legitimate penological interest in protecting inmates from harm

3  inflicted by other inmates.  In his affidavit, Helling states:

> NNCC holds a large population of elderly, infirmed, and easily-confused inmates, owing largely to the design of the NNCC facility, which features a "flat yard" design and houses regional medical facilities, both of which accommodate elderly and infirmed inmates. Protecting elderly, infirmed, and easily-confused inmates from potentially predatory, fraudulent, and abusive conduct of other inmates is a legitimate correctional goal at NNCC and within the NDOC system.  The elderly, infirmed and easily-confused inmates are especially vulnerable to exploitation. Such victimization is very difficult to discover, as physical force is often not used.  Verbal threats and fraudulent behavior often leave no outward, discernible indicators or physical injuries.  When such victimization or potential victimization has been discovered, stopping the harm or threat of harm must be immediate. Physically separating an elderly, infirmed, or easily-confused inmate claiming to be a likely victim of fraud, from the suspected perpetrators or collaborators of that fraud is a legitimate correctional goal at NNCC.  Given that NNCC has a large concentration of elderly inmates, as compared to other correctional facilities within the NDOC system, separating inmate Klein from inmates housed at NNCC would further the goal of separating inmate Klein from elderly, infirmed, or easily-confused and easily-manipulated inmates.

18  #48, Helling's Affidavit, D-MSJ 83, ¶ 25.

19      The court has reviewed defendants' sealed and *in camera* submission, the "Confidential

20  NDOC Inspector General's Report and Materials," *see* #62 (*sealed*),[7] and concludes that the

21  ―――――――――――

[7] The plaintiff submitted a request that the court take judicial notice of the fact that the "final" version of the Inspector General's Confidential Report is dated April 29, 2005 but that the decision to transfer the plaintiff to LCC was made on April 27, 2005 (#64).  The plaintiff argues that the defendants are attempting to make after-the-fact and bogus justifications for the transfer decision.  The court notes that while the "final" version of the report is dated April 29, 2005, the investigation began on April 14, 2005.  The report's supporting documentation is dated between April 14, 2005 and April 22, 2005, thus, the court concludes that the defendants likely had much of the information available to them on April 27, 2005 when the committee made the transfer decision.  The court concludes that merely because the final draft of the investigative report was dated two days after the decision to transfer the plaintiff to LCC does not mean that

defendants, in their discretion, had a reasonable basis for suspecting the plaintiff of fraud and beginning an investigation. The confidential documentation as well as plaintiff's own statements, reveal that it was the plaintiff who referred Inmate A to his attorney, Ms. Hearne, for assistance in setting up a trust account for Inmate A's retirement funds (#38, p. 12).[8] The evidence before the court also reveals that plaintiff's sister, Tonja Brown, was the trustee for the Inmate A Trust, that her husband Robert Brown was the successor trustee, and that Ms. Brown had check-writing privileges on Inmate A's checking account (#62, D-MSJ 29-39 (*sealed*)). Fearing that he had been defrauded because he had not received any statements of his trust account in which he had over $50,000 in retirement funds, Inmate A approached prison officials. *Id.*, D-MSJ 28 (*sealed*).

Defendants have a responsibility to secure the safety of all inmates, especially those who may be unable to protect themselves, such as elderly and disabled prisoners. However, as set out in more detail below, the court concludes that reasonable minds can differ over whether the plaintiff's transfer was for a legitimate penological purpose. Therefore, viewing the evidence in the light most favorable to the defendants, the plaintiff has failed to demonstrate that his transfer was not for the legitimate correctional purpose of securing the safety of Inmate A and others

---

the defendants did not review a previous draft that contained the same or similar information.

[8] In his complaint and motions, plaintiff admits that he referred Inmate A to Ms. Hearne (#21, ¶¶ 13 & 15; *see also* #38, p. 4, ¶ 9; *see also* #58, p. 21). Ms. Hearne's affidavit also states that the plaintiff referred Inmate A to her (#39, ¶ 11). The plaintiff's sister, Tonja Brown, also states in her affidavit that the plaintiff referred Inmate A to Ms. Hearne (#42, Affidavit dated May 19, 2006). However, plaintiff concurrently submitted the affidavit of another inmate, Joseph M. Carpino, who states that it was he (inmate Carpino) who referred Inmate A to Ms. Hearne (#41, ¶ 3). Additionally, the plaintiff submitted two affidavits from Inmate A – one that says that it was the plaintiff who referred him to Ms. Hearne (#40, Affidavit dated July 7, 2005, ¶ 1) and another that states "another one of my friends," not the plaintiff, found him the attorney who drafted his trust (#40, Affidavit dated October 24, 2005, ¶ 4). Oddly enough, in the same motion in which he states that he *did* refer Inmate A to Ms. Hearne, *see* #58, p. 21, plaintiff *denies* referring Inmate A to Ms. Hearne. *See* #58, p. 23.

similarly situated.[9]  As plaintiff has not met his burden, his motion for summary judgment must be denied.

### b. Conspiracy to Retaliate

The plaintiff has alleged that the defendants conspired to retaliate against him for exercising his constitutional rights (#21, p. 4).[10]  Even giving the full benefit of the doubt to the plaintiff, the court finds that there is absolutely no evidence that the defendants made an agreement or had a "meeting of the minds" to retaliate against the plaintiff for exercising his Constitutional rights.  The plaintiff's motion for summary judgment is denied as to the plaintiff's conspiracy claim.

### 2. Defendants' cross-motion for summary judgment

### a. Retaliation

Defendants make essentially the same arguments in their cross-motion for summary judgment (#50) as they did in their opposition to plaintiff's motion for summary judgment (#48).  Plaintiff also makes similar arguments in his opposition to defendants' cross-motion for summary judgment (#58) as he did in his own motion for summary judgment (#38).  Most arguments are

---

[9]  The court's conclusion that plaintiff has failed to demonstrate the absence of a legitimate correctional purpose is not to say that the court has concluded that defendants, in fact, had a legitimate correctional goal in transferring plaintiff.  The court's conclusion is that the plaintiff has not met his burden on summary judgment. *See Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1997) (The inmate bears the burden of pleading and proving the absence of legitimate correctional goals for the alleged retaliatory action).  Whether the defendants had a legitimate penological goal in instituting the transfer of plaintiff that was devoid of retaliatory intent is a material fact that is at issue, as set out in further detail below.

[10]  Plaintiff does not bring his conspiracy claim pursuant to 42 U.S.C. § 1985, however, the court construes his pleading liberally. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

sufficiently summarized above; however, to the extent that certain arguments are more relevant to the defendants' motion for summary judgment, the court now addresses them.

### (1) The "Some Evidence" Standard

The defendants maintain that in the Ninth Circuit, the court must apply a deferential "some evidence" standard to decisions of prison boards (#60, p. 6, *citing Barnett v. Centoni*, 31 F.3d 813 (9th Cir. 1994)).  Defendants contend that the plaintiff's retaliation claim is essentially a challenge to the decision by the reclassification committee to transfer him to LCC, and as such, the "some evidence" standard applies to support the legitimate correctional decision (#50, p. 13).  Plaintiff contends that his claim is a retaliation claim and that in *Hines v. Gomez*, 108 F.3d 265 (9th Cir. 1997), the Ninth Circuit held that the *Barnett* "some evidence" standard does not apply to retaliation claims and instead only applies to due process claims attacking the result of a disciplinary board's proceeding (#58, p. 7).  Plaintiff notes that the reason for this distinction is because the "some evidence" standard gives deference to the actions of a prison board because boards are constrained by "procedural safeguards" and make their own credibility determinations based on independent evidence.  *Id.*

In *Barnett*, the plaintiff alleged retaliation by prison officials in finding him guilty of possessing alcohol and in classifying him as a gang member.  *Barnett*, 31 F.3d at 815-16.  The court found that summary judgment in favor of the defendants on the plaintiff's retaliation claim was proper because (1) the defendants had submitted "some evidence" to support the plaintiff's reclassification – namely, the guilty verdict by the disciplinary board for possessing alcohol, an affidavit by a prison official stating that there was no retaliation, and a confidential report with

16

supporting documentation "indicating" that the plaintiff was a member of a gang – and; (2) the board's reclassification of the plaintiff was for the legitimate penological purpose of maintaining prison discipline.  *Id*. at 816, *citing Superintendent v. Hill*, 472 U.S. 445 (1985).

In *Hines*, the Ninth Circuit held that while the deferential "some evidence" standard applied to "a prison disciplinary board's finding of a rule violation," the standard did not apply to "a prison guard's initial accusation of a rule violation where the guard's accusation itself allegedly is false and retaliatory."  *Hines v. Gomez*, 108 F.3d 265, 268 (9th Cir. 1997).  The court based its decision on its reading of *Hill*, in which the Supreme Court had based *its* decision on the fact that a prisoner is afforded procedural safeguards such as advance notice and the opportunity to attend and present evidence when a disciplinary board makes a decision.  *Id*. at 268-69.  The *Hines* court noted that *Barnett* "focused on a prison classification committee decision to discipline the prisoner," and stated that when the "prison factfinder's guilt determination... necessarily considers the merits of the charge," the "some evidence" standard applies.  *Id*. at 269-70.

The Ninth Circuit subsequently clarified in *Bruce v. Ylst*, 351 F.3d 1283 (9th Cir. 2003) that "In *Hines*,... *we held that the 'some evidence' standard of Hill did not apply to retaliation claims.*  The 'some evidence' standard applies only to due process claims attacking the result of a disciplinary board's proceeding."  *Ylst*, 351 F.3d at 1289 (emphasis added).

The defendants argue that the plaintiff is challenging the prison board's reclassification and transfer decision, such that he is "*implicitly* asserting a substantive "due process" claim" (#60, p. 7, n.19).  The court disagrees with the defendants' characterization of the plaintiff's claim.  The court notes that the plaintiff does not allege a due process violation, but a retaliation claim (#21,

17

pp. 3, 4).   The plaintiff is not alleging that the *board/reclassification committee* acted in a retaliatory manner, but that the individual defendants – Helling, Benedetti and Fournier – acted in a retaliatory manner by commencing an investigation and essentially spoon-feeding information to the committee in order to effectuate the plaintiff's transfer before the investigation was complete.  *Id.*, pp. 2-4.  As noted by the defendants themselves, none of the named defendants was on the board that reclassified the plaintiff (#60, p. 9, n.25; *see also id.*, p. 8, n. 21; *see also* #60, Benedetti Affidavit, D-MSJ 168, ¶4b).  Further, if the plaintiff *had* alleged a due process violation, there likely would be an issue of fact as to whether the plaintiff was given any procedural protections in his reclassification.[11]  Because plaintiff's claim is a retaliation claim against the *individual* defendants for initiating the transfer proceedings, and not a due process claim against the prison board for making the transfer decision without affording the plaintiff due process, the deferential "some evidence" standard does not apply.   *Bruce v. Ylst*, 351 F.3d 1283, (9th Cir. 2003) ("[t]he 'some evidence' standard of *Hill* [does] not apply to retaliation claims" and "applies only to due process claims attacking the result of a disciplinary board's proceeding").  Thus, defendants need more than just "some evidence" to support their proffered justification for effectuating the plaintiff's transfer.

### (2) Genuine Issues of Material Fact as to Defendants' Motive

Viewing the evidence in the light most favorable to the plaintiff, the court concludes that

---

[11] The plaintiff states that he was not given notice of the reclassification hearing, did not attend and was not able to present evidence in his defense (#58, p.8).  Defendants, however, argue that the plaintiff did attend the hearing because Benedetti states in his affidavit that the term "Personal" written in plaintiff's chrono file on April 27, 2005 means that the plaintiff attended the hearing (#60, p. 8; *see also* #60, D-MSJ 168, ¶ 4c).  However, it is unclear whether plaintiff was allowed to present a defense if in fact he did attend the hearing.  It is obviously disputed as to whether the plaintiff was afforded procedural protections.

genuine issues of material fact exist regarding the defendants' motive or intent in transferring the plaintiff to LCC. These issues of material fact preclude granting the defendants' cross-motion for summary judgment.

First, the plaintiff offers the timing of the transfer prior to the completion of the investigation and prior to his grievances being resolved. The investigation and transfer occurred close in time to the class action letter from Ms. Hearne, the publishing of the book *To Prove His Innocence*, and before the investigation was concluded (#43, Ex. 2, Helling's Response to Request for Admissions, p. 3, No. 9). In *Pratt*, the court recognized that "timing can properly be considered as circumstantial evidence of retaliatory intent." *Pratt*, 65 F.3d at 808. Although the defendants argue that it was important to separate the plaintiff from Inmate A and others similarly situated immediately, there is also an issue of fact as to whether the inmate population at LCC is significantly different than that at NNCC. *See infra*, fn. 13.

Second, the plaintiff raises the fact that "although plaintiff stood to gain nothing by way of the [Inmate A] trust, there was another NNCC Unit 3 inmate named as a beneficiary to the [Inmate A] trust" (#58, p. 21). Plaintiff alleges that, to his knowledge, this other inmate was not transferred or punished. *Id.*, p. 29. A review of the Inmate A Trust Agreement shows that another inmate, Joseph Carpino,[12] was the named beneficiary of the Inmate A Trust (#62, D-MSJ 32 (*sealed*)). The plaintiff notes that in April 2005, the trustee (plaintiff's sister, Tonja Brown) spoke with the Inspector General investigator, Larry Adamson, who allegedly told her that "if anyone should have been locked up during the course of the investigation it should have been the inmate

_____

[12] Inmate Carpino is the same inmate who states in his affidavit (in contradiction to other evidence) that it was he, not the plaintiff, who referred Inmate A to Ms. Hearne (#41, ¶ 3).

1    that was named in [Inmate A]'s Trust, not Mr. Klein" (#42, Brown Affidavit, dated May 19, 2006;
2    *see also* #38, p. 13).

3          Defendants do not respond to the allegations about inmate Carpino, except to argue that
4    they had more than enough information to investigate the plaintiff (#60, p. 15).   From the
5    information provided to the court, it appears that inmate Carpino was just as involved in the Inmate
6    A Trust Account as the plaintiff, since Carpino was a named beneficiary to the Trust, *see* #62, D-
7    MSJ 32 (*sealed*), and he admits to being involved in initially persuading Inmate A to create a trust
8    (#41, Carpino Affidavit, p. 1, § 3).   The defendants have not given this court any information
9    regarding whether inmate Carpino's participation was also investigated or whether he suffered any
10   consequence for his involvement.   While the court agrees that the defendants had cause to
11   investigate the plaintiff's involvement, assuming that inmate Carpino was not investigated and
12   transferred away from elderly inmates in a similar manner as the plaintiff, it appears from the
13   evidence before the court that the plaintiff was treated differently.
14
15

16         Defendants argue that even if there was retaliatory motive to transfer the plaintiff, if there
17   was *also* a legitimate penological reason to transfer the plaintiff, there can be no finding of
18   unconstitutional retaliation.   *See* #60, p. 5 ("It would be illegal for DOC officials to transfer the
19   plaintiff ***solely*** in retaliation for his exercise of protected First Amendment rights") (emphasis in
20   #60, *citing Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995)).   Thus, defendants argue that the
21   plaintiff must prove the defendants *only* reason for transferring the plaintiff was retaliation.   The
22   court finds that the defendants' justifications for the transfer are at issue here.   If the plaintiff was
23   treated differently than another inmate who appears to have been just as involved – if not more –
24
25
26
27
28

in the alleged scam as the plaintiff, the court cannot conclude that the defendant's proffered "legitimate penological basis" for the defendants' initiation of the plaintiff's transfer prior to the close of the investigation was not pretextual.  There exists a genuine issue of material fact regarding whether the defendants' motives and intent were retaliatory in transferring the plaintiff to LCC.

Defendants also argue that there is no evidence that they knew of the plaintiff's First Amendment activities because the plaintiff's name was not on the class action letter (#60, p. 11). Plaintiff responds that the defendants did know he was the inmate behind the letter because it was his attorney who wrote it, and defendants were well aware that Ms. Hearne represented plaintiff in his appeals (#58, p.12).  The court notes that the defendants were at least aware of the book that the plaintiff contributed to because Helling denied Ms. Hearne's request to meet with the plaintiff to have him sign the book, *see* #48, D-MSJ 11, and Helling apparently would not allow the book into the prison (#60, p. 13, *incorporating by reference* #48, p. 18, *citing* Plaintiff's Deposition).

Although defendants state that plaintiff's 2001 placement at NNCC was always intended to be temporary because prison officials planned to transfer plaintiff to LCC, *see* #48, p. 11 and #51, D-MSJ 5 (entry for May 1, 2001), the plaintiff was housed at NNCC for approximately four years.  The court finds that four years is not "temporary."

Finally, plaintiff notes that he has never been charged with wrongdoing.  Defendants admit this fact, stating "ultimately, no formal disciplinary or criminal charges were leveled against inmate Nolan Klein related to the Investigation," *see* #50, p. 5, ¶ 9 and p. 21; however, they fail to explain why this is so.  Despite not bringing charges or making a formal finding of wrongdoing, the

defendants argue that in Helling's "professional judgment and opinion," the plaintiff "should remain as a 'separatee' of the above-identified inmates,... because Inmate A and others similarly situated "remain especially prone to victimization of fraudulent schemes by [the plaintiff]" (#50, p. 5, ¶ 10).

The court finds it curious that the plaintiff has never been charged with a violation. While it appears that there was cause to investigate the circumstances surrounding the Inmate A Trust, it is unclear whether investigators ever came to a conclusion that a crime or fraud was committed and by whom. For instance, there is no information before the court regarding whether investigators concluded that the trust was actually fraudulent, that money was missing from Inmate A's trust account, and if so, who took the money. The court is not clear whether, to this day, the investigation is "completed" or whether charges might be brought sometime in the future. The plaintiff was transferred before any of these issues were resolved (#43, Ex. 2, Helling's Response to Request for Admissions, p. 3, No. 9). Reasonable minds can differ as to whether, had the defendants waited, they may have found no wrongdoing or basis to transfer the plaintiff. It appears to the court that the plaintiff is being kept at LCC only pursuant to Helling's opinion that he should be kept away from elderly inmates. While the court must defer to the discretion of prison officials, there is a limit to that deference, and the court finds that there is a question here as to the defendants' motives underlying their discretionary decisions.

The plaintiff argues that there are as many or more elderly inmates at LCC. If this is in fact the case,[13] it is unclear to the court why the plaintiff would be transferred to LCC and why he

---

[13] The defendants submit an affidavit stating that 8.9% of the NNCC population is over age 60, while 5.35% of the LCC population is over age 60 (#60, D-MSJ 171, ¶ 5; *see also* #60, p. 18). The court notes that when one considers the total populations for each institution – 1,275 inmates (NNCC) and 1,548 inmates

would remain there.  Although the defendants do provide information regarding the percentages of elderly inmates at NNCC and LCC as a whole, they do not provide information regarding how many elderly inmates inhabit the restricted units at NNCC, such as Unit 7b, as compared to NNCC Unit 3 and LCC.  As the Ninth Circuit has noted, if the defendants abuse prison procedure as a pretext to silence or punish an inmate for protected First Amendment conduct, "they cannot assert that [the plaintiff's transfer] served a valid penological purpose, even though he may have *arguably* ended up where he belonged."  *Ylst*, 351 F.3d at 1289 (emphasis in original).

The court agrees that the circumstances of the Inmate A Trust account are suspicious, most notably that plaintiff's family and attorney were intimately involved in the trust account.  Thus, it appears that there was good cause to investigate the plaintiff.  However, reasonable minds can differ as to whether there was retaliatory motive in the defendants' instigation of the transfer itself where defendants punish one inmate but allow another equally involved inmate to remain where he was without investigation.  Further, reasonable minds can differ as to whether there is a retaliatory motive based on the fact that the defendants never ultimately found the plaintiff guilty of wrongdoing but continue to keep him at a different institution where three are arguably almost as many elderly inmates.  The court concludes that the timing of the transfer, combined with the lack of investigation into inmate Carpino's role and the fact that no charges have ever been brought against the plaintiff, raise genuine issues of material fact regarding whether there was retaliatory motive behind the transfer.  *Ylst*, 351 F.3d at 1289.

---

(LCC) as of October 31, 2006 – there is no significant difference.  *See* http://www.doc.nv.gov/stats/2006/10/2006-10_DAILY_POP_COUNTS.pdf, page 31.  This means that as of October 31, 2006, there are approximately 113 inmates over the age of 60 at NNCC and 83 inmates over the age of 60 at LCC.

**b. Conspiracy to Retaliate**

As noted above, there is absolutely no evidence before the court that the defendants made an agreement or conspired to retaliate against the plaintiff.  As such, the court grants summary judgment in favor of the defendants as to plaintiff's conspiracy claim.

## III. CONCLUSION

Based on the foregoing and for good cause appearing, the court concludes that plaintiff has failed to meet his burden of demonstrating that there was no legitimate penological reason for his transfer to LCC and has failed to present any evidence of a conspiracy to retaliate on the part of the defendants.  Defendants have failed to show there are no genuine issues of material fact as to their motive behind the plaintiff's transfer prior to the completion of an investigation that ultimately resulted in no charges being filed.  Therefore, the court recommends that plaintiff's motion for summary judgment (#38) be **DENIED** and defendants' cross-motion for summary judgment (#50) be **DENIED** as to the retaliation claim but **GRANTED** as to the conspiracy claim.

The parties are advised:

1.    Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, the parties may file specific written objections to this report and recommendation within ten days of receipt.  These objections should be entitled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.    This report and recommendation is not an appealable order and any notice of appeal pursuant to Fed. R. App. P. 4(a)(1) should not be filed until entry of the District Court's judgment.

## IV.  RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that

(1) Plaintiff's motion for summary judgment (#38) be **DENIED**; and

(2) Defendants' cross-motion for summary judgment (#50) be **DENIED** as to the retaliation claim and **GRANTED** as to the conspiracy claim.

**DATED:** January 17, 2007.

_____
**UNITED STATES MAGISTRATE JUDGE**

25